# Murphey to use v. Greybill, Appellant.

*Practice, C. P.—Motion for judgment non obstante veredicto—Evidence
—Fraud—Act of April 22, 1905, P. L. 286.*

In an action of assumpsit where the defendant sets up fraud as a de-
fense, and the court overrules a request for binding instructions for
plaintiff, and a verdict is rendered for defendant, the plaintiff may move
for judgment upon the whole record non obstante veredicto as provided
by the Act of April 22, 1905, P. L. 286, and this motion does not need
any prior reservation of a question of law to support it.

In such a case the appellate court will proceed to a consideration of
the evidence, not as a jury would in a case where there is a conflict of
testimony, or where the credibility of witnesses is involved, nor as a
trial court would in a case where a motion for new trial is made upon
the ground that the verdict was against the weight of the testimony,
but as an appellate court does in a case where the trial judge has affirmed
the plaintiff's point requesting binding instructions in his favor, and the
defendant has appealed from the judgment upon the verdict so directed.

*False representations—Fraud—Declaration of intention.*

Expressions of purpose, promises and predictions, that fail of realiza-
tion, are fraudulent in law only when they are connected with mis-
representations respecting alleged facts, or falsely held out a prospect
of collateral advantages that leads the vendor to accept a price greatly
below the real value of the property parted with.

*Evidence—Contract—Written instrument—Prior negotiations.*

When parties have deliberately put their engagements into writing, in such terms as import legal obligations, without any uncertainty as to the object or extent of such engagements, all prior negotiations are merged in and extinguished by the written instrument which is the final result of their bargainings.

*Vendor and vendee—Lease—Consideration.*

Where a vendor of land has accepted a lease of the land from the vendee, has received full consideration for the land, and subsequently acknowledged the binding force of the lease, he cannot allege that the lease was procured from him by fraud.

*Vendor and vendee—Escrow—Condition—Voidable title—Delivery—Covenant—Fraud.*

An escrow is a written instrument, which by its terms imports a legal obligation, deposited by the grantor, promissor or obligor, or his agent with a stranger or third person, that is, a person not a party to the instrument, such as the grantee, promisee or obligee, to be kept by the depository until the performance of a condition or the happening of a certain event, and then to be delivered over to take effect. Where the future delivery depends upon the payment of money, or the performance of some other condition, and the grantee obtains possession of the deed without performing the condition, he acquires at the most but a voidable title to the land described. If the condition precedent be expressed in writing, the construction of the writing is for the court. While the courts generally hold the grantee to very strict compliance with the conditions precedent to delivery, yet, in determining from the writing what they are, no constrained construction is to be put upon the words in order to make that a condition precedent which was not clearly so intended by the parties.

Where words can be construed either as a condition, a reservation, or a covenant, the latter construction is favored.

An owner of a mill deposited with a trust company a deed for his property, in escrow. By the terms of the escrow agreement he was to receive money and stock of a corporation, which was to take title to the property. Subsequently he was notified that the option in the escrow agreement had been exercised. The trust company delivered the deed to the purchaser, and forwarded the money and stocks to the grantor, who receipted for them. About the same time the grantor executed a lease whereby he covenanted to operate the mill for a period of sixty days as lessee. After the organization of the corporation he acknowledged his liability for rent to the company. In an action against him for rent he attempted to avoid the lease on the ground that certain representations had been made to him as to the source from which the corporations was to derive the money part of the consideration. There

was no evidence that any false representations were made to him to his injury, at the time of the execution of the deed in escrow, or that he was induced to sign the deed by any representations that the money part of the consideration was derived or was to be derived from any particular source. *Held*, that the defense set up was insufficient.

Argued March 11, 1907. Appeal, No. 22, March T., 1907, by defendant, from judgment of C. P. Cumberland Co., Nov. T., 1904, No. 219, for plaintiff non obstante veredicto in case of Joseph C. Murphey to use of David R. Locher and the Security Title & Trust Company of York, Pa., Receivers of the Eastern Milling & Export Company, v. John D. Greybill. Before RICE, P. J., PORTER, HENDERSON, MORRISON, ORLADY, HEAD and BEAVER, JJ. Affirmed.

Assumpsit for rent. Before SADLER, P. J.
The facts are stated in the opinion of the Superior Court.

*Error assigned* was in entering judgment for plaintiff non obstante veredicto.

*R. W. Woods*, for appellant.—The court did not have a right to set aside the verdict on the point presented for binding instructions under the Act of April 22, 1905, P. L. 286 : Dalmas v. Kemble, 215 Pa. 410 ; Casey v. Penna. Asphalt Paving Co., 198 Pa. 348 ; North American Oil Co. v. Forsyth, 48 Pa. 291 ; Butts v. Armor, 164 Pa. 73 ; Reel v. Elder, 62 Pa. 308.

Agreement of escrow must be taken as a whole because it contained as conditions precedent the terms upon which the grantor, John D. Greybill, the appellant in this case, was willing to deliver his deed : Dempwolf v. Greybill, 213 Pa. 163.

When a promoter induces subscriptions on the promise that in consideration of stock to be retained by him as part of the plan he will furnish subscriptions to stock for the benefit of the subscribers, that promise is part of the consideration entering into the contract of subscription, and a default on the part of the promoter avoids the contract : Beem v. McKusick, 10 Cal. 538.

*H. C. Niles*, of *Niles & Neff*, and *Conrad Hambleton*, of *Wetzel & Hambleton*, with them *Burr, Brown & Lloyd*, for ap-

pellees.—There was no conflict of evidence in this case when the same was submitted to the jury. In entering judgment for plaintiff the learned court was obliged to assume that all of the evidence adduced on the part of the defendant, which had been legally admitted, was true, but that notwithstanding its verity, it was insufficient in law to defeat a recovery: Delmas v. Kemble, 215 Pa. 410.

All conversation, all negotiations, all oral promises, all verbal agreements, are forever merged in, superseded and extinguished by the sealed instrument which is the final outcome and result of the bargaining of the parties: Krueger v. Nicola, 205 Pa. 38; Miller v. Fulmer, 25 Pa. Superior Ct. 106; Grove v. Hodges, 55 Pa. 504.

Even illegal acts committed by the officers of the milling company, after Greybill became a stockholder, would be no defense to this action: Dettra v. Kestner, 147 Pa. 566.

After discovery of alleged fraud Greybill elected to affirm the contract by acknowledging its validity: Leaming v. Wise, 73 Pa. 173; Eichman v. Hersker, 170 Pa. 414; Grymes v. Sanders, 93 U. S. 55; Dunn v. Bank, 204 Pa. 53.

OPINION BY RICE, P. J., October 7, 1907:

This appeal arises upon the record of an action of assumpit upon a lease, dated April 8, 1901, for the term of sixty days, at a rental of $100, executed by Joseph C. Murphey as lessor and by the defendant as lessee, and assigned by Murphey to Philadelphia Milling Company, which, by change of name, subsequently became Eastern Milling & Export Company of Pennsylvania. Later, in a suit in equity in the circuit court of the United States for the eastern district of Pennsylvania, in which Eastern Milling & Export Company, a corporation organized under the laws of New Jersey in March, 1901, was plaintiff, and Eastern Milling & Export Company of Pennsylvania was defendant, in which suit it was averred and admitted that all of the outstanding shares of the capital stock of the Pennsylvania company were owned by the New Jersey company, receivers of the Pennsylvania company were appointed who brought this action for the rent that was alleged to have accrued between the date of the lease and March 8, 1904. It was admitted by the defendant upon the trial that he had been

in possession of the premises during the whole of that period and had paid no rent. As shown by the affidavit of defense and the bill of particulars filed by him, as well as by the proceedings on the trial, and his counsel's statement of the question involved in this appeal, his sole defense was that his execution of the lease was induced by fraud. In view of one branch of the argument of appellant's counsel, it seems important to refer in detail to the proceedings which led up to the judgment under review. At the conclusion of the testimony the plaintiffs presented the following point: "Under all the evidence in the case the verdict must be for the plaintiff for the amount claimed in his statement, to wit: Seventeen hundred and fifty ($1,750) dollars, less the amount paid by the defendant on account of taxes on the leased property, to wit: five hundred and twenty-six and seventy-five one hundredths ($526.75) dollars, with interest on said balance from March 8, 1904; the amount of the verdict to which plaintiff is entitled being thirteen hundred and ninety-eight and twenty-eight one hundredths ($1,398.28) dollars." The court refused the point and submitted the question of fraud to the jury who found for the defendant. Before verdict, the plaintiffs excepted to the charge and the answer to their point, and requested that they be reduced to writing and filed, and after verdict, moved the court to have the evidence certified and filed so as to become part of the record, and to enter judgment for them, non obstante veredicto, upon the whole record. The court, in an elaborate and well-considered opinion reviewing the evidence, sustained the motion, and from the judgment so entered the defendant took this appeal.

The defendant's first contention is, that the question of fraud having been submitted to the jury, and the fact having been found by them, and no question of law having been reserved, the court had no power to enter a contrary judgment for the plaintiffs on the ground that the evidence was insufficient to sustain the verdict. As the law was prior to the Act of April 22, 1905, P. L. 286, this would have been so; the court could have set aside the verdict and granted a new trial, but could not have entered judgment for the plaintiffs, even though under the evidence they were entitled in law to recover. But the act of 1905 "broadens the power of the

judge in this respect, that whereas heretofore the verdict was required to be for the plaintiff and the reservation to be of leave to enter judgment for the defendant non obstante, now what is reserved is a request for binding direction to the jury, and may be for either plaintiff or defendant. But though thus enlarged so as to include both parties, the power of the judge is the same as it was before. He is ' to enter such judgment as should have been entered upon that evidence,' or in other words, to treat the motion for judgment as if it was a motion for binding direction at the trial, and to enter judgment as if such direction had been given and a verdict rendered in accordance. What the judge may do is still the same in substance, but the time when he may do it is enlarged so as to allow deliberate review and consideration of the facts and the law upon the whole evidence. If upon such consideration it shall appear that a binding direction for either party would have been proper at the close of the trial, the court may enter judgment later with the same effect. But, on the other hand, if it should appear that there was conflict of evidence on a material fact, or any reason why there could not have been a binding direction, then there can be no judgment against the verdict now : " Dalmas v. Kemble, 215 Pa. 410. A plainer statement of the province of the court under the act of 1905 could not be made. It is thus seen that the fact that the question of fraud was submitted to the jury, and was decided by them in favor of the defendant, could not affect the decision of the question raised by the plaintiffs' motion, nor preclude the court from entering the judgment which ought to be entered under the evidence. The question is, whether binding direction for the plaintiffs as requested in their point would have been proper. It would have been proper if there was no evidence which, if believed by the jury, was sufficient in law or in equity to avoid the lease upon the ground of fraud. In other words, if in view of the admitted facts, and the facts alleged by the defendant which a jury could find from the evidence, as well as the inferences favorable to the defendant which a jury could reasonably draw from those facts, a binding direction in favor of the plaintiff would have been error, then this judgment should be reversed ; otherwise, not. We therefore proceed to a consideration of the evidence, not as a

jury would in a case where there is a conflict of testimony, or where the credibility of witnesses is involved, nor as a trial court would in a case where a motion for new trial is made upon the ground that the verdict was against the weight of the testimony, but as an appellate court does in a case where the trial judge has affirmed the plaintiff's point requesting binding instructions in his favor, and the defendant has appealed from the judgment upon the verdict so directed.

The defendant had been in the milling business for many years, and was the owner of a flour mill in the borough of Carlisle. He testified that on February 15, 1901, Newton Jackson and Charles K. Hannan presented to him a scheme, in which he was asked to join by putting in his mill property, to combine many of the flour mills of Pennsylvania in one corporate management and ownership. He alleges that the plan presented to him was, to create a company with a $1,000,000 preferred stock, and $3,000,000 common stock; that the preferred stock was to be used in the purchase of mills of that value, and that with it was to go to the owners of the mills, as a bonus, common stock to the amount of $1,000,000; that the remaining common stock amounting to $2,000,000 was to go to the promoters, underwriters, trust companies, and the like, for organizing the company and putting it in operation; that bonds secured by a mortgage upon the mill properties were to be issued for $700,000, or thereabouts, to obtain a working capital; and that no money derived from the sale of these bonds should be used for any other purpose. The defendant suggested, so he testifies, that he did not think it altogether fair that $2,000,000 of common stock be issued to the promoters and capitalists concerned in the scheme, and that he thought they ought to assume some of the preferred stock. This subject was discussed, but nothing definite was agreed upon. They separated with the promise on his part that he would consider the proposed scheme, and would be in Philadelphia in a week or two, and determine what he would do. On the twenty-sixth of the same month the defendant and Jackson met in Philadelphia and determined on the main features of an agreement, which was to be embodied in writing. To that end he received from Jackson the written form of an option he was to give, and upon his return home his attorney

prepared the paper of February 28, 1901, which in some particulars, but not in all, is a copy of the form of option given to him by Jackson. This paper having been executed by the defendant in the presence of his legal adviser, was sent to Jackson. Some of its provisions are of the highest importance in the determination of the question before us; therefore we quote them at length.

After reciting the defendant's ownership of the described mill property and its appurtenances, including the use of a siding running to the Cumberland Valley Railroad, and the fact that Jackson was engaged in consolidating the Paxton Flour Mill and others, and had offered to purchase the defendant's mill, etc., for the sum of $25,000 payable as thereinafter set forth, which the paper stated was a satisfactory consideration, the paper proceeds as follows:

" Therefore, I, the undersigned, John D. Greybill, in consideration of the sum of one dollar, the receipt of which is hereby acknowledged do hereby agree to prepare a deed for the property above described, transferring the same to Newton Jackson, his heirs or assigns, or to a corporation to be designated by him, and accept in payment thereof the sum of $6,250 in cash, and $18,750 in six per cent preferred stock of the Eastern Milling and Export Company, or such other company as may be organized by the said Newton Jackson, to acquire said property, and in addition the sum of $18,750 of the common stock of said company. In addition to the $18,750 of preferred and common stock as herein set forth, there is to be issued the sum of $6,250 in six per cent preferred stock and a like sum in common stock, which is to be transferred to the said Newton Jackson for the $6,250 in cash as hereinbefore set forth. The deed to the property to be deposited in escrow with the Union Trust Company of Philadelphia, on or before March 15, 1901, and upon delivery by the said Newton Jackson of the considerations named above, said deed shall be recorded in the office for recording of deeds, at Carlisle, Pennsylvania, and become the property of said Newton Jackson or company. It is also agreed that this option shall become void in case the Paxton Flour Mills and others now contemplated do not go into the consolidation. It is also agreed that the preferred stock issued by the said Eastern Milling and Export Company shall be limited to such an amount as may be

necessary to purchase milling property, and no preferred stock shall be issued for profit to any attorney, underwriter, promoter or trust company. It is hereby further agreed that said Newton Jackson or said company shall pay to the vendor cash for the stock of grain, flour or feed on hand at the time of transfer at cost value, and in case the vendor and vendee cannot agree on a price, then the vendor is to have the privilege of disposing of said grain, flour or feed to anyone. In case the said Newton Jackson fails to comply with the terms and conditions of this contract on or before June 1, 1901, the said trust company is hereby authorized to return said deed to the vendor, and this contract should be of no further force or effect."

We shall refer to the provisions of this paper more particularly later, but for the present we remark that it will be seen from the foregoing recital of facts testified to by the defendant, that in the negotiations of February 15 nothing was agreed upon; that the representations of Jackson, if such they may be called, did not relate to facts existing in the past or in the present, the company not having been formed at that time; that no promise was made which bound anyone, and that the terms of the agreement the defendant might decide to make, or of the option he might decide to give, were left for future determination. Necessarily, also, the disposition of the stock of a corporation that had not been formed, and many other matters relating to the plan of organization, to the acquisition of property by such corporation, and to the methods to be pursued therein and in the management of its affairs generally, could not be determined at that time. As to the effect of such predictions and expressions of purpose as are alleged to have been made on February 15, we refer to Grove v. Hodges, 55 Pa. 504; Miller v. Fulmer, 25 Pa. Superior Ct. 106, and the cases therein cited. It is to be noticed further, as remarked by the learned judge below, that full deliberation was exercised by the defendant in the preparation and execution of the option agreement of February 23, and that these were done under the supervision of his own legal adviser. So far as appears, nothing was omitted from that paper which was necessary to express the full agreement he intended to make, and no artifice, trick, deceit or misrepresentation was resorted to to procure anything to be inserted in it to which he did not give intelli-

gent and unconstrained assent.   We see no ground for excepting it from the general rule, that when parties have deliberately put their engagements into writing, in such terms as import legal obligation, without any uncertainty as to the object or extent of such engagements, all prior negotiations are merged in and extinguished by the written instrument which is the final result of their bargainings.   Therefore, we need not further allude to the evidence of what occurred on February 15 ; it is dismissed from consideration as having no bearing, or at least no controlling effect, upon the question for decision.

We turn then to a recital, as brief as may be, of the transactions occurring after the execution and delivery of the option agreement.

On March 16, 1901, Jackson wrote to the defendant that he proposed to exercise the option within a few days, and requesting him to have a deed prepared conveying his property to Eastern Milling & Export Company in the name of Joseph C. Murphey as grantee—explaining that the title was to be taken in his name temporarily for legal purposes—and deposit the same with the Union Trust Company of Philadelphia.   In reply the defendant wrote inquiring, " Whether or not you have secured a million dollars' worth of property options and procured a charter ? "   To this inquiry Jackson wrote in reply, ' that the consolidation is going through, and we have secured our charter, $4,000,000 capital, and the property to be taken over will aggregate over $1,000,000 valuation.   We expect to pay for your property on April 1, and we are making our arrangements to that effect.   Please have the deed prepared at once," etc.   On March 21 the defendant wrote to Jackson that owing to the absence of his counsel he would be unable to have the deed prepared before the following Monday, which he hoped would be in due time, and on March 30 he forwarded to the Union Trust Company the deed drawn to Murphey as grantee.   In the letter accompanying it he stated that the deed was delivered to the trust company to be placed in escrow in accordance with the option given to Jackson, and he requested the trust company to give him a receipt to that effect. Accordingly, the Union Trust Company, by Clarence L. Harper, its president, sent to the defendant a receipt, stating therein

that the deed was " to be held in escrow under terms of agreement dated February 28, 1901, between the depositor and Newton Jackson."

In order to avoid the necessity of alluding to this correspondence later, we remark now that we find nothing therein, which, whether taken by itself or in connection with other evidence in the case, makes it relevant otherwise than as showing that the only terms and conditions under which the deed was deposited with and accepted by the Union Trust Company were those expressed in the option agreement of February 28th.

We come then to the evidence relating directly to the execution of the lease.    On April 5, 1901, W. G. Audenried, Jr., acting for Eastern Milling and Export Company, wrote to the defendant as follows : " We wired you to-day as follows : ' Have exercised option to purchase your mill, and paid money and stock to Union Trust Company.    Transfer the insurance policies to-day to Joseph C. Murphey, loss, if any, payable to H. C. Niles, mortgagee, as his interest may appear,' from which you will note we have exercised the option on your mill, and shall expect you down here to make settlement.    Please be sure to bring the insurance policies with you.    We shall also expect you to operate the mill for sixty days further, and to that end have prepared a lease, which you can execute at the Union Trust Company, while here."    In compliance with this notice, the defendant, accompanied by his counsel, appeared at the Union Trust Company's office on April 8, 1901, and then and there executed the lease upon which this action was brought— the premises being the same as those described in the deed to Murphey above referred to.    The persons present at the execution of the lease were the defendant, his counsel Mr. Hays, Mr. Adams, who was the trust officer of the Union Trust Company, and Mr. Murphey.    The first three testified as to what occurred at that time, but gave materially different versions. They substantially agree, however, in this, that a question was raised as to whether the deed was sufficient to include the railroad siding referred to in the option agreement, and that it was agreed that a deed expressly covering it should be made and executed by the defendant.    After referring to this matter, the defendant further testified as follows : " I read over this lease and said What's the use for this—this property deal is not

in operation yet, and this deed may not go through, because these matters have not been adjusted yet" (evidently referring to the matter of the siding that had been discussed) " and I do not care about leasing the mill. They said that will be all right, if the agreement won't be carried out, the deed with this lease would be returned to me—under these conditions I signed the agreement for sixty days—the lease—for $100 rent for sixty days." In a letter to the Union Trust Company dated May 31, 1901, to which a postscript dated June 7, 1901, was added, the defendant wrote as follows : " Enclosed please find deed for use of siding which is in connection with a deed of my mill property already passed. I have the insurance policies in course of transfer and if the conditions have been fulfilled, which I presume they have, kindly forward to me the stock and draft due me upon receipt of this and oblige." In the postscript he says : " I just mailed deed to Mr. Niles, York, Pa., for approval." The deed was executed on June 7, and in a letter of June 14, Adams, the trust officer of the Union Trust Company, acknowledged the receipt of it. In the same communication he said : " Your letter of June 11th has also been received. We have delayed replying because we have been waiting for the Real Estate Title Insurance Company to pass upon this matter, and indicate to us that the title was clear, so that we might safely pay to you the consideration which we have in our hands, having received the same from Mr. Jackson, acting for the Eastern Milling and Export Company, early in April." He also stated that his company had been informed on that day that there was still a defect in the title to the mill, to remedy which quitclaim deeds from certain parties would be required, and requested the defendant to co-operate with Mr. Niles in having this matter closed up. " As I said above," he concludes, " the consideration has been in our hands some weeks, and we should like to settle this matter as soon as possible." What negotiations or correspondence took place in the interim does not appear ; but on June 19, the agreed consideration for his property, consisting of a check for $6,250, a certificate for 375 shares of preferred stock and a certificate for 375 shares of common stock of the Eastern Milling and Export Company, was forwarded to the defendant, which, in his letter of June 20, he acknowleged to be " consideration in full for my mill property conveyed to

Joseph C. Murphey." Furthermore, the lease was distinctly recognized by the defendant in his letter of July 5, 1901, to the Eastern Milling and Export Company, in which he said: " I received a bill for rent due on mill. Kindly consider this as an off-set in the settlement of my mill stuff on taking the mill over for operation; " and again in his letter of July 12, 1901, to the president of the company, in which he said: " I do not care to rent for an indefinite time. Shall I operate it " (the mill) " in order that we may keep the trade together? "

We need not take up time in discussing the question whether the defendant's allegation of an oral promise made at the time the lease was executed is sustained by the quantity and quality of evidence that is required to affect a written instrument in that way. If the case turned upon that question, it might well be doubted whether the evidence would be sufficient for the purpose; for, it is to be noticed, the promise testified to by him is materially different from that testified to by Mr. Hays, and the testimony of both is in conflict with that of Mr. Adams. But assuming the verity of what the defendant testified to on that subject, the fact is plainly insufficient to affect his obligation to pay the stipulated rent from the date of the lease, inasmuch as when he had perfected the conveyance he had given, as he was bound to do by the option agreement, he was paid the full consideration, and subsequently acknowledged the binding force of the lease in the manner above stated.

But it is strenuously urged that the conditions upon which the deed deposited in escrow with the Union Trust Company was to be delivered by the depositary were not complied with, and that this fact was not made known to the defendant prior to his execution of the lease, but was kept concealed from him until after he had receipted for the consideration of the deed, and had surrendered to the Union Trust Company the receipt that company had given when the deed was deposited in escrow.

One particular in which it is claimed that the conditions were not complied with is, that the agreement that the preferred stock should be limited to such amount as should be necessary to purchase milling property, and that none should be issued for profit to any attorney, underwriter, promoter or trust company, was not kept. In support of this contention, attention

is called to a transaction in May, 1901, in which it is claimed preferred stock was issued to J. R. Bucher for profit. We need not go into the details of this or similar transactions, for it is plain that the agreement above referred to was neither a condition precedent, nor a condition subsequent. Whatever may be the remedy of the defendant for the violation of the agreement, it is not by avoiding his deed or the lease.

Another particular in which it is claimed that the conditions precedent were not complied with is, that the money consideration ($6,250), which was delivered to the Union Trust Company and by it delivered to the defendant, was not furnished by Jackson in return for preferred stock of that amount and an equal amount of common stock as a bonus, but was part of the proceeds of a temporary loan of $25,000, made to Eastern Milling and Export Company upon a mortgage in favor of H. C. Niles, executed on April 5, 1901, by Murphey, by direction of the milling company, upon two properties taken into the combination—one being that described in the defendant's deed. On July 1, 1901, a mortgage for $800,000 covering all of the properties that went into the combination was executed, and from the proceeds of that loan the temporary loan was paid. There was evidence admitted or offered from which a jury could find that the money paid to the defendant came from this temporary loan; also that the fact was not known to the defendant at the time he receipted for the consideration, as well as when he executed the lease; and further, it may be assumed, for the purposes of this discussion, that he would have done neither of these things had it not been for the representation, expressed or fairly to be implied, that the conditions upon which the title to his property was to pass had been complied with. But we find no evidence to sustain a finding that he did them under the inducement of representation that the money part of the consideration was derived by the milling company from a particular source, except as such representation is to be implied in the general representation above stated. Would these facts sustain a verdict that his action in the particulars referred to was induced by fraud—such a fraud as would enable him, upon discovery of the facts, and return or offer to return the money and shares of stock he had received, to a cancellation of the deed and the lease?

An escrow is a written instrument, which by its terms imports a legal obligation, deposited by the grantor, promissor or obligor, or his agent with a stranger or third person, that is, a person not a party to the instrument, such as the grantee, promisee or obligee, to be kept by the depositary until the performance of a condition or the happening of a certain event, and then to be delivered over to take effect : 16 Cyclopedia of Law & Procedure, 561. Where the future delivery depends upon the payment of money, or the performance of some other condition, and the grantee obtains possession of the deed fraudulently without performing the condition, he acquires at the most but a voidable title to the land described : Landon v. Brown, 160 Pa. 538; Dempwolf v. Greybill, 213 Pa. 163. If the condition precedent be expressed in writing, the construction of the writing is for the court. While the courts generally hold the grantee to very strict compliance with the conditions precedent to delivery, yet, in determining from the writing what they are, no strained construction is to be put upon the words in order to make that a condition precedent which was not clearly so intended by the parties. On the contrary, in the case last cited the rule was held applicable in the construction of such an instrument—indeed, in the construction of the very instrument now under consideration—that where words can be construed either as a condition, a reservation or a covenant, the latter construction is favored. It seems hardly necessary to resort to this general rule of construction, for the instrument declares in unequivocal terms that upon delivery of the considerations mentioned in the instrument the deed should be recorded and the property become the property of Jackson or the company designated by him. This was the express condition precedent to delivery; the contention that it was also intended to be a condition precedent that the money part of the consideration be derived by the milling company from Jackson in return for preferred stock of that amount, and not by loan from him or any other person, rests on very doubtful and uncertain inference at the best. It is not of sufficient strength to overcome or qualify the express condition above alluded to, or to enlarge its requirements beyond what its plain terms imply. This particular question need not be discussed further, because we regard it as having been

authoritatively determined in accordance with the foregoing conclusion in Dempwolf v. Greybill.   The learned trial judge there held that the instrument authorized the depositary to deliver the deed for recording when it received the money and shares of stock which were stated therein to be the "satisfactory consideration;" and upon appeal it was declared that he was "clearly right in the construction of the escrow agreement." Hence, if we assume that the defendant executed the lease and subsequently acknowledged and affirmed its binding effect, and also accepted the money and shares of stock in full of the consideration stipulated in his contract, upon the faith of representations, express or implied, that the conditions precedent to the delivery of his deed had been fulfilled, he is not in position to avoid the deed or the lease, unless such representations were false, which they were not, or unless the source from which the milling company derived the money part of the consideration was fraudulently misrepresented to him to his injury, and of this we find no evidence.

Our conclusion upon the whole evidence is that no such fraud is established thereby, or could be inferred therefrom by a jury, as would entitle the defendant to have the lease in question either annulled or reformed.   In arriving at that conclusion we have also taken into account some matters offered to be proved but which offers were rejected.   As to the evidence rejected to which no allusion has been made, suffice it to say that we have considered these rulings, and the argument of appellant's counsel upon the assignments of error in which they are embraced, and are of opinion that even if the evidence had been admitted, the result could not be different from what it is.   There are other points that were mentioned in argument, amongst which are: the delay in seeking relief; the question whether the defendant made a proper tender, or was bound to make a tender of the shares of stock and the money consideration he had received; the fact, that although on April 5 he had notice that a mortgage in favor of H. C. Niles had been or was to be placed on the property, he made no inquiry as to its purpose prior to executing the lease; and the point that, owing to the insolvency of the company, the rights of creditors, and of others who with him put their properties into this unfortunate venture, are more or less involved

in this effort to be relieved from his obligation for the rent that had accrued. We will not discuss the evidence relative to these points, nor their bearing, because it would unduly prolong this opinion, and for the better reason that the decision of the case may be rested upon the broader ground already stated.

The assignments of error are overruled and the judgment is affirmed.